# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-20149-MARTINEZ/AOR

EUGENE WILLIAMS, III,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Eugene Williams, III's ("Claimant") Motion for Summary Judgment and Memorandum of Law (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 15] and Defendant Andrew Saul, Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 18]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 11].[1]  For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI") on January 5, 2017, alleging a disability onset date of November 8, 2015.  TR. 27.  The application was denied initially and upon reconsideration.  Id.

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

Upon Claimant's written request, a hearing was held on December 4, 2018, before Administrative Law Judge James Cole Cartledge ("ALJ Cartledge"), at which Claimant and Vocational Expert Lauren Lovely ("VE Lovely") testified.  Id. at 46-78.

On February 26, 2019, ALJ Cartledge issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2018.  Id. at 29.

(2) Claimant had not engaged in substantial gainful activity since November 8, 2015, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: dysfunction-major joints, spine disorders, osteoarthritis and allied disorders, and chronic obstructive pulmonary disease ("COPD") (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id. Claimant had the following non-severe impairments: disorders of the gastrointestinal system; a thyroid related disorder; hyperlipidemia; carpal tunnel syndrome; depressive, bipolar and other related disorders.  Id. at 30.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 34.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to additional limitations.  Id.[3]

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

(6) Claimant was unable to perform any past relevant work. (20 C.F.R. §§ 404.1565 and 416.965). <u>Id.</u> at 38.[4]

(7) Claimant was born on September 2, 1966 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963). <u>Id.</u> at 39.

(8) Claimant had at least a high school education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964). <u>Id.</u>

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled" whether or not Claimant had transferable job skills (<u>See</u> SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). <u>Id.</u>[5]

(10) Considering Claimant's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). <u>Id.</u>

(11) Claimant had not been under a disability, as defined in the Social Security Act, from November 8, 2015, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)). <u>Id.</u> at 40.

On November 13, 2019, the Appeals Council denied a request for review of ALJ Cartledge's Unfavorable Decision. <u>Id.</u> at 8-10. On January 1, 2020, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Cartledge's final administrative decision [D.E. 1].

In support of his contention that ALJ Cartledge's Unfavorable Decision should be reversed, Claimant argues that:

I.      The ALJ erred in determining the RFC assessment because he failed to:

---

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

[5] SSRs are a series of precedential decisions relating to the programs administered by the SSA and are published under the authority of the Commissioner of Social Security. <u>See</u> http://ssa.gov/regulations/def-ssr.htm.

    a.   Properly evaluate Claimant's mental impairments;

    b.   Account for functional limitations due to severe COPD;

    c.   Consider whether Claimant required a cane to ambulate; and

    d.   Properly consider Claimant's diverticulitis.

II.     The ALJ failed to properly assess Claimant's subjective symptoms.

See Claimant's Motion for Summary Judgment [D.E. 15].  The undersigned finds no merit in any of these contentions.

### RELEVANT MEDICAL EVIDENCE

**I.    Physical Health Providers**

    **A. Treating Sources**

        **1) Memorial Healthcare System**

On January 5, 2016, Claimant presented to the Emergency Room at Memorial Healthcare System ("Memorial ER") complaining of right-sided rib pain that had been ongoing for the previous month but had worsened the day before.  TR. 918.  He reported that the pain was mild, with painful spasms that were aggravated by deep breathing and coughing and alleviated by rest; he stated that he had had similar pain 20 years before from a previous injury in which he was hit by a forklift, but that he had not experienced the pain since.  Id.  He denied any fever, chills, diaphoresis, leg swelling, or dyspnea.  Id.  A review of systems was unremarkable except for cough and right-sided rib pain.  Id. at 918-19.  Claimant stated that he smoked 1/2 pack of cigarettes per day and used marijuana.  Id. at 919.  A physical examination revealed that Claimant had pain with inspiration along the right axillary line, but all other findings were normal.  Id. at 920-21.  Specifically, Claimant was oriented to person, place, and time; he was well-developed and well-nourished; and his cardiovascular, pulmonary, abdominal, musculoskeletal, and neurological systems were normal.  Id.  An electrocardiogram ("EKG") revealed normal findings, and a chest

x-ray showed no evidence of active disease, focal pulmonary consolidation, pleural effusion, pulmonary edema, or pneumothorax. <u>Id.</u> at 922, 927. Claimant was diagnosed with chest wall pain and atypical chest pain and discharged. <u>Id.</u> at 922.

On January 24, 2016, Claimant presented to Memorial ER complaining of intermittent chest pain. <u>Id.</u> at 813. A review of systems was unremarkable except for shortness of beath and chest pain. <u>Id.</u> at 813-14. A physical examination revealed that Claimant was oriented to person, place, and time; he was well-developed and well-nourished; and his cardiovascular, pulmonary, abdominal, musculoskeletal, and neurological systems were normal. <u>Id.</u> at 816. Claimant's mood, affect, behavior, judgment, and thought content were normal. <u>Id.</u> Claimant's chest x-ray and EKG results were normal; and the chest x-ray indicated no acute cardiopulmonary disease. <u>Id.</u> at 817, 841. Claimant's heart was normal with no edema; his abdomen had no masses; and his musculoskeletal system had a normal range of motion with no joint edema. <u>Id.</u> at 820. Claimant was advised to follow up with a primary care provider for further evaluation of possible pre-hypertension/hypertension. <u>Id.</u> at 818. Claimant's urine drug screen was positive for cocaine and he was counseled on smoking and cocaine cessation. <u>Id.</u> at 820. He was diagnosed with cocaine induced chest pain and discharged on January 25, 2016. <u>Id.</u> at 818-19. Claimant's laboratory test results indicated that: his cholesterol was borderline high; his triglycerides were high; his HDL cholesterol was normal; his LDL cholesterol was near optimal; and his non-HDL cholesterol was borderline high. <u>Id.</u> at 846-47.

### 2) Camillus House

On January 26, 2016, Claimant presented to Camillus House to establish primary care and was seen by Raisa Antonia Gutierrez, ARNP ("NP Gutierrez"). <u>Id.</u> at 433. Claimant reported the following history: in 1987, he was hit in the back with a forklift; in 1994, he fell off a 2-story

building; and in 1985, he had a bullet wound in his left upper arm.  Id.  He reported a history of dyslipidemia, gastric ulcer, and muscle spasm.  Id.  He reported that he used to be on disability, but he declined it as he no longer needed it; however, he was once again struggling with pain and difficulty working.  Id.  He reported that he smoked half a pack of cigarettes daily.  Id. 435.  A review of systems was unremarkable except for heartburn, lower back pain, and muscle spasms. Id. at 436.  On physical examination, NP Gutierrez noted that all findings were normal except for lumbosacral spine pain which was elicited by motion.  Id. at 439.  Claimant was diagnosed with gastritis, dyslipidemia, rheumatoid arthritis, arthralgias in multiple sites, and muscle spasm, and showing clinically significant symptoms for depression.  Id. at 440.   Claimant was advised to cease tobacco use and lose weight, and prescribed medication for hyperlipidemia, rheumatoid arthritis, joint pain, and muscle spasm.  Id. at 441-42.

Claimant's lab results from February 8, 2016, indicated that his total cholesterol of 218 and LDL cholesterol of 139 were slightly above normal range.  Id. at 518.

Claimant followed up with NP Gutierrez on February 24, 2016.  Id. at 447.  He reported that the muscle relaxant medication was controlling spasms; however, when he was not on medication, he would tighten up.  Id.  He also reported sexual dysfunction due to the muscle relaxant medication.  Id.  On physical examination, NP Gutierrez noted that all findings were normal; specifically, Claimant's appearance and affect were normal, and his mood was euthymic. Id. at 445. Claimant was diagnosed with a common cold and secondary insomnia.  Id. at 445.  NP Gutierrez prescribed medication for pain, hyperlipidemia, insomnia, and common cold; advised Claimant to lose weight and follow a low salt and low-fat diet; and referred him to a smoking cessation program.  Id. at 447-49.  Claimant was provided with education materials on high blood pressure, tobacco addiction, and general healthy living.  Id. at 446.

Claimant's lab results from May 5, 2016 indicated normal rheumatoid factor results.  Id. at 520.

On May 25, 2016, Claimant saw NP Gutierrez for follow up and medication refill.  Id. at 455.  Claimant reported that he had shoulder pain due to a fall in the shower, and that he continued to have muscle spasms.  Id.  A review of systems was unremarkable except for muscle spasms.  Id.  On physical examination, NP Gutierrez noted that all findings were normal; specifically, Claimant's mood was euthymic, and his appearance and affect were normal.  Id. at 457.  Claimant was assessed with a body mass index ("BMI") of 27.4 and diagnosed with thyroid disorder.  Id. at 458.  NP Gutierrez noted that a May 14, 2016 CT scan revealed a diffusely enlarged thyroid gland.  Id. at 459.  NP Gutierrez prescribed medications for muscle spasm.  Id.

On June 7, 2016, Claimant saw NP Gutierrez for follow up, review of test results, and medication refill.  Id. at 461.  On physical examination, NP Gutierrez noted that all findings were normal; specifically, Claimant's mood was euthymic, and his appearance and affect were normal.  Id. at 463.  Claimant was assessed with BMI of 27.3, and diagnosed with bulging interverbal disc, and carpal tunnel syndrome.  Id.  NP Gutierrez prescribed medications and recommended wrist braces for carpal tunnel.  Id. at 465

On August 2, 2016, Claimant saw Stephanie Lerner, RN ("RN Lerner") for a blood pressure check.  Id. at 475.  RN Lerner noted that Claimant's blood pressure was 154/84 and documented an elevated blood pressure care plan.  Id. at 476.

Claimant's chest x-rays, taken on August 18, 2016, revealed normal findings.  Id. at 584.

On September 8, 2016, Claimant saw Jim Torres, M.D. ("Dr. Torres") for follow up on x-ray results and complaints of lumbar back pain.  Id. at 483.  Claimant's active problems were listed as: arthralgias in multiple sites; high body mass index; dyslipidemia; functional diarrhea; gastritis;

lower back pain; muscle spasm; rheumatoid arthritis; secondary insomnia; thyroid disorders; and tobacco use.  Id. at 483.  Claimant stated that he had lumbar back pain on the left side that sometimes radiated to the leg.  Id. at 484.  A review of systems was unremarkable except for loose stools.  Id. at 485.  On physical examination, Dr. Torres noted that all findings were normal; specifically, Claimant had no deformity of the fingers or thoracic asymmetry, and his appearance, mood, affect, and thought content were normal.  Id. at 485-88.  Claimant was diagnosed with lower back pain, BMI of 27.3, and arthralgias in multiple sites.  Id. at 488.   Dr. Torres prescribed medication for diarrhea and low back pain.  Id.

On October 10, 2016, Claimant saw Rose Anderson, ARNP ("NP Anderson") for follow up.  Id. at 477.  Claimant reported: worsening muscle spasms of his ribs occurring when he rotated his torso; a cyst on his anterior tibial area that was bothersome at night and that he wanted removed; a protruding right clavicle that was painful if he laid a certain way; and a need for reading glasses. Id.  On physical examination, NP Anderson noted that Claimant's right clavicle was slightly more prominent than the left but was not tender to the touch and was smooth with no nodules.  Id. Claimant was diagnosed with lower back pain, BMI of 27.3, dyslipidemia, and muscle spasm.  Id. at 480.  Claimant's blood pressure was 146/81.  Id. at 481.  NP Anderson prescribed medication, referred him to a rheumatologist, and requested that he be provided with reading glasses.  Id.

On October 13, 2016, Claimant saw Tracy A. Derryberry, RN ("RN Derryberry") for follow up and medication refill.  Id. at 491.  Claimant's blood pressure was 119/80.  Id.

On October 19, 2016, Claimant saw Carlos Brito, ARNP ("NP Brito") for follow up after a hospital discharge for diverticulitis.  Id. at 493.  A review of systems revealed heartburn, arthralgias, and feelings of hopelessness and anhedonia.  Id. at 498.  On physical examination, NP Brito noted that Claimant's fingers and lumbar spine exhibited tenderness and that Claimant's

mood was depressed.  Id. at 500.  Claimant was diagnosed with major depressive disorder, gastritis, diverticulitis of colon without perforation or abscess, and osteoarthritis.  Id. at 502.  NP Brito prescribed medication, instructed Claimant on diet, and referred him for a colonoscopy and physical therapy.  Id. at 502.

On November 10, 2016, Claimant saw Dr. Torres for follow up and reported that he had a cold, wanted a cyst removed, had experienced some improvement with the prescribed antidepressant, but was still having issues with depression.  Id. at 504.  Dr. Torres discussed increasing the medication dose and referring him for behavioral health services.  Id.  A review of systems was unremarkable.  Id. at 506.  Claimant was diagnosed with hyperlipidemia, major depressive disorder, polyneuropathy, common cold, COPD, gastritis, sebaceous cyst, and osteoarthritis.  Id. at 507-08.  Dr. Torres increased the dose of antidepressant medication and referred Claimant to physical therapy and to a general surgeon to have the sebaceous cyst removed. Id. at 508.

On January 17, 2017, Claimant saw NP Brito for follow up.  Id. at 511.  A review of systems was unremarkable.  Id. at 513.  Claimant was diagnosed with hyperlipidemia and nicotine dependence and was counseled on weight management and smoking cessation.  Id. at 516-17.

Claimant's lumbar spine MRI results from March 28, 2017, revealed mild degenerative changes of the sacroiliac joins and mild atherosclerotic disease of the abdominal aorta; Claimant's paravertebral soft tissues were within normal range.  Id. at 809.

On February 1, 2017, Claimant saw Dr. Torres for follow up post hospitalization for surgery for his lower left extremity lesion.  Id. at 641.  Claimant stated that he had chronic pain, expressed concern for sleep apnea, and stated that he had to use an inhaler 2-3 times per week.  Id. A review of systems was unremarkable.  Id. at 644.  Claimant was diagnosed with other

adrenogenital disorders, major depressive disorder, chronic pain, COPD, joint pain, and radiculopathy of the lumbar region. Id. at 645. Dr. Torres prescribed medication. Id. at 645.

On May 8, 2017, Claimant saw Dr. Torres for follow up and reported that he was not seeing a pain physician and that he continued to have severe pain. Id. at 798. A review of systems was unremarkable. Id. at 801. Claimant was diagnosed with lower back pain, tobacco use, high BMI, major depressive disorder, recurrent, moderate, chronic pain, COPD, and osteoarthritis. Id. Dr. Torres prescribed medication and referred Claimant to a pain clinic and requested that he be provided with a walking cane and back brace. Id. at 802.

On July 14, 2017, Claimant saw Dr. Torres for follow up and reported that he had received treatment for his back from a pain physician and reported improvement. Id. at 754. A review of systems was unremarkable. Id. at 756. Claimant was diagnosed with lower back pain, tobacco use, high BMI, peripheral vascular disease, mild COPD, gastritis, dyslipidemia, arthralgia of the knee, lumbar canal stenosis, and neuropathy, hyperlipidemia, major depressive disorder, recurrent, severe without psychotic feature, polyneuropathy, peripheral vascular disease, gastritis, osteoarthritis, knee pain, and spinal stenosis of the lumbar region. Id. at 757-58. Dr. Torres prescribed medication and requested that he be provided with knee braces and compression socks. Id. at 758.

Claimant's lab results from July 12, 2018, indicated that his total cholesterol of 239 and LDL cholesterol of 161 were above normal range. Id. at 968.

On October 16, 2017, Claimant saw Dr. Torres for follow up. Id. at 732. A review of systems was unremarkable. Id. Claimant was diagnosed with common cold, heel spur, COPD, constipation, diverticulitis, low back pain, hyperlipidemia, hip pain, polyneuropathy, and

osteoarthritis.  Id. at 733-34.  Dr. Torres prescribed medication and referred Claimant to physical therapy, noting that Claimant's chronic pain showed improvement with a chiropractor.  Id. at 733.

On August 16, 2018, Claimant saw Saraswati R. Iobst, M.D. ("Dr. Iobst") for follow up after a hospital discharge for resection surgery for diverticulitis approximately two weeks prior. Id. at 957.  Claimant stated that he had ongoing diffuse lower abdominal pain post-surgery.  Id. A review of systems was otherwise unremarkable.  Id. at 958.  Claimant was diagnosed with diverticulitis of the colon and clinically significant symptoms for depression.  Id. at 960.  Dr. Iobst noted that Claimant had no acute complications from the sigmoid resection and that the surgical wound was healing well; he was advised to follow up with a pain specialist and mental health counselor.  Id. at 961.

### 3)        Jackson Health System

On May 13, 2016, Claimant presented to the emergency department at Jackson Health System ("Jackson ER") with complaints of neck pain and rib pain after slipping and falling in the bathtub and hitting his head.  Id. at 413.  A physical examination revealed that Claimant had an abrasion on the left side of his chest but all other findings were normal.  Id. at 415.  Claimant was alert and in no acute distress; and he was cooperative, with appropriate mood and affect, and normal judgment.  Id.  A chest x-ray showed no evidence of acute cardiopulmonary disease or displaced rib fractures.  Id. at 417.  Claimant was diagnosed with contusion of the chest and neck strain and discharged.  Id. at 416.

A computed tomography ("CT") scan completed on May 14, 2016 showed no acute intercranial hemorrhage or fractures or dislocations of the cervical spine but did show a diffusely enlarged thyroid.  Id. at 418-19.

A CT scan of Claimant's abdomen and pelvis completed on September 24, 2016 revealed diverticulitis at the level of the sigmoid colon and stable enlarged appearance of bilateral adrenal glands representing bilateral adrenal adenomas.  Id. at 406.  Claimant also underwent the following x-ray examinations: chest x-ray, which indicated no radiographic evidence of acute cardiopulmonary disease; neck soft tissue x-ray, which indicated no significant tracheal narrowing; and lumbosacral spine x-ray, which indicated mild lumbar spondylosis.  Id. at 402-04.

An ultrasound exam of Claimant's thyroid completed on September 26, 2016 revealed a sub-centimeter hyperplastic nodule in the left inferolateral lobe.  Id. at 407.  Claimant also underwent an EKG examination, which indicated that: there was concentric remodeling of the left ventricle; the left ventricular systolic function was normal; the mitral valve and tissue doppler pattern were indicative of Grade 1 diastolic dysfunction (abnormal relaxation); and the right ventricular systolic pressure was normal.  Id. at 410.

AN MRI of Claimant's lumbosacral spine completed on September 28, 2106 revealed mild lumbar spondylosis.  Id.  at 402.

### 4)      University of Miami Health System ("UHealth")

On September 9, 2016, Claimant was examined by rheumatologist Schartess S. Culpepper Pace, M.D. ("Dr. Pace").  Id. at 490.  Claimant reported that: he had been diagnosed with rheumatoid arthritis over 10 years before, which was never treated with conventional disease-modifying drug therapy; he had joint pain in various joints with stiffness all over; he had intermittent swelling of various joints, including in his hands and feet; and he had a history of gastritis and diverticular disease.  Id.  On examination, Dr. Pace noted that Claimant was well developed and in no distress; his bilateral shoulders were without effusions; he had subtle changes at the distal interphalangeal ("dip") joints with mild tenderness to palpation; there was no synovitis

of the knees, ankles, or metatarsophalangeal ("mtp") joints; and there was no knee effusion or deformities.  Id.  Claimant had a cyst over the distal left lower extremity.  Id.  Dr. Pace found that Claimant had degenerative joint disease, with a history that was not completely consistent with inflammatory arthritis; and that he also had myalgias possibly related to statin, thyroid disease, or domestic issues.  Id.  Dr. Pace recommended x-rays and an anti-inflammatory drug.  Id.

On September 14, 2016, Claimant underwent x-ray examinations, which revealed: moderate osteoarthritis in the right shoulder joint; mild osteoarthritis in the left shoulder joint; mild degenerative disc disease, but no vertebral body height loss and no listhesis in the lumbar spine; and, as to his hands, joint spaces were preserved, without discrete erosions, with normal alignment and no fracture or osteonecrosis.  Id. at 582-83.

A computed tomography ("CT") scan of Claimant's abdomen and pelvis completed on September 24, 2016 showed mild atherosclerotic disease, diverticulitis at the level of the sigmoid colon, and stable enlarged appearance of bilateral adrenal glands, representing bilateral adrenal adenomas.  Id. at 406.  Claimant was advised to follow up with a colonoscopy.  Id.

On October 10, 2016, Claimant saw Dr. Pace, complaining of joint pain and muscle spasms in the area of his ribs.  Id. at 571.  A review of systems revealed that Claimant had joint pain, gait problems, joint swelling, myalgias and neck pain.  Id. at 573.  He was diagnosed with intermittent asymmetric polyarthralgia on his bands, shoulders, feet, and knees.  Id. at 574.  Dr. Pace noted that Claimant's lab results were not suggestive of inflammation or rheumatoid arthritis, but the x-ray results were consistent with degenerative joint disease/osteoarthritis.  Id. at 571.  Claimant had no synovitis of the elbows, wrists, knees, ankles, finger joints, or toe joints.  Id. at 574.

On December 30, 2016, Claimant received right shoulder corticosteroid injections from Julianne Munoz, M.D. ("Dr. Munoz") to treat his right rotator cuff arthropathy and AC joint

arthritis; three minutes after the injections, Claimant reported a 50% decrease in his symptoms. Id. at 531.

On January 3, 2017, Claimant was seen by general surgeon David Huddleston, MD ("Dr. Huddleston") and diagnosed with a probable sebaceous cyst of the lower left extremity. Id. at 657. Dr. Huddleston noted that Claimant had an abnormal blood pressure reading of 161/99. Id. at 658.

On January 17, 2017, Claimant saw Marcelo Fabian Larsen, M.D. ("Dr. Larsen") for colorectal cancer screening. Id. at 549. Dr. Larsen noted that Claimant had a past medical history of colonic diverticulitis which required 2 hospitalizations, but Claimant was completely asymptomatic. Id. Claimant also had past medical history of kidney infection, high cholesterol, and rheumatoid arthritis. Id. Claimant reported smoking cigarettes daily and marijuana weekly. Id. A review of systems was unremarkable. Id. On physical examination, Dr. Larsen noted that all findings were normal and that Claimant was very pleasant during the appointment. Id.

On January 19, 2017, Claimant underwent surgery to have a left anterior leg hemorrhagic cyst removed by Dr. Huddleston. Id. at 548.

On January 23, 2107, Claimant presented to the Jackson ER due to nausea and umbilical pain that radiated to the rectum. Id. at 659. He stated that the pain was mild and aching and did not radiate; he did not have chest pain, diarrhea, shortness of breath, or vomiting. Id. at 660. A review of systems was unremarkable except for abdominal pain. Id. at 661. On physical examination, Claimant was found to have diffuse abdominal tenderness. Id. at 662. Claimant was diagnosed with: diverticulitis of the colon which was improving; lower abdominal pain which was improving; and pre-hypertension/hypertension. Id. at 663. Claimant was advised to follow up with a gastroenterologist. Id.

On January 24, 2017, Claimant underwent a CT scan of his abdomen and pelvis, which showed bulky and enlarged adrenal glands and multiple diverticula in the distal descending colon and sigmoid colon, with evidence of heterogeneous appearance with thickening and edema of a focal segment of the sigmoid colon with fat stranding, likely focal diverticulitis or colitis, but with no evidence of surrounding enlarged lymphadenopathy, focal collection, or abscess.  Id. at 636-37.

On March 28, 2017, Claimant underwent a colonoscopy by Dr. Larsen which showed diverticulosis in the sigmoid colon and descending colon.  Id. at 709.  Dr. Larsen recommended that Claimant repeat the colonoscopy in 10 years for surveillance.  Id.

On May 16, 2017, Claimant underwent an electrodiagnosis evaluation of his upper extremities, which revealed evidence of carpal tunnel at the wrists, but no evidence of ulnar neuropathy and no evidence of left acute cervical radiculopathy.  Id. at 715.  Claimant was diagnosed with bilateral carpal tunnel syndrome and instructed to try wrist splints.  Id. at 718-19.

On July 6, 2017, Claimant followed up with Dr. Pace regarding degenerative disease, carpal tunnel, rash, and history of diverticulitis.  Id. at 762.  Claimant reported pain that radiated down the posterior side of his left leg, and pain throughout his body involving his hips, knees, and hands.  Id.  He stated that pain medication and muscle relaxer helped somewhat, and that physical therapy significantly helped with the muscle tension in his neck and low back.  Id.  He had been wearing bilateral wrist splints for a month.  Id.  On examination, Dr. Pace noted that Claimant had tenderness and mild bony changes involving the metacarpophalangeal ("mcp") and proximal interphalangeal ("pip") joints of his hands, but no active synovitis.  Id. at 763.  Claimant's gastrointestinal system was assessed as normal.  Id.  Dr. Pace prescribed pain medication to be

taken as needed, recommended trigger point injections, and referred Claimant to a course of physical therapy for his chronic neck pain and low back pain. Id. at 763-64.

On July 26, 2018, Claimant underwent colorectal surgery performed by Floriano Marchetti, M.D. ("Dr. Marchetti"). Id. at 1012. Claimant reported that he had had a total of nine diverticular disease episodes since 2003 or 2004, and that he was suffering from abdominal pain. Id. A review of systems was unremarkable except for abdominal pain and frequent, 4-5 times, nighttime urination. Id. at 1014. On physical examination, Dr. Marchetti noted that all findings were normal; specifically, Claimant exhibited no edema or tenderness, and he was oriented to person, place, and time, and had normal mood, affect, behavior, judgment, and thought content. Id. at 1016-17. Dr. Marchetti counseled Claimant on conservative and operative management of diverticulitis, and Claimant asked to proceed with surgery. Id. at 1020. Dr. Marchetti performed a robotic colon resection for acute diverticulitis of the proximal sigmoid colon, and Claimant was discharged after he was able to tolerate a diet. Id. at 1021-28.

## B. Non-treating Sources

### 1) SSA Single Decision Maker Shane Hobstetter ("Mr. Hobstetter")

On March 14, 2017, Mr. Hobstetter completed a Physical RFC Assessment for Claimant. Id. at 95-98. Mr. Hobstetter opined that Claimant had the following exertional limitations: he could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; he could stand and/or walk and sit for a total of 6 hours in an 8-hour work day with normal breaks; he was unlimited in his ability to push and/or pull. Id. at 96.

Mr. Hobstetter opined that Claimant had the following manipulative limitations: he had limited ability to reach left in front and/or laterally, right in front and/or laterally, left overhead, and right overhead; his ability to handle, finger, and feel was unlimited. Id. at 96-97. Mr.

Hobstetter explained that Claimant was limited to occasional reaching due to chronic shoulder impairment.  Id. at 97.  Mr. Hobstetter further opined that Claimant had no postural, visual, communicative, or environmental limitations.  Id.

### 2) State Agency Medical Consultant Brian Clear, M.D. ("Dr. Clear")

On July 20, 2017, Dr. Clear completed a Physical RFC Assessment for Claimant.  Id. at 127-31.  Dr. Clear opined that Claimant had the following exertional limitations: he could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; he could stand and/or walk and sit for a total of 6 hours in an 8-hour work day with normal breaks; he was unlimited in his ability to push and/or pull.  Id. at 128.

Dr. Clear opined that Claimant had the following postural limitations: he could frequently climb ramps or stairs, stoop, kneel, and crouch, and crawl; he could occasionally climb ladders, ropes or scaffolds or crawl; his ability to balance was unlimited.  Id.  Dr. Clear opined that Claimant had the following manipulative limitations: he had limited ability to reach right overhead; his ability to handle, finger, and feel was unlimited.  Id. at 129.  Dr. Clear explained that in consideration of his pain, right shoulder reaching was limited to occasionally, but otherwise found supported full manipulative ability.  Id.  Dr. Clear opined that Claimant had the following environmental limitations: he should avoid concentrated exposure to vibration; his ability to be exposed to extreme cold, extreme heat, wetness, humidity, noise, hazards, fumes, odors, dusts, gases, or poor ventilation was unlimited.  Id. at 130.  Dr. Clear explained that concentrated exposure to vibration was expected to exacerbate pain and was limited accordingly.  Id.  Dr. Clear further opined that Claimant had no visual or communicative limitations.  Id. at 129.

## II. Mental Health Providers

### A. Treating Sources

#### 1)        Camillus House

On February 24, 2016, Claimant underwent a biopsychosocial assessment from Karen Hayes, LCSW ("LCSW Hayes").  Id. at 450.  Claimant complained of loss of energy, angry outbursts, decreased appetite, difficulty concentrating, crying spells, fatigue, irritability, sadness, difficulty sleeping, decreased sociability, and increased worrying.  Id.  He denied having mania, hallucinations, or delusions.  Id. He reported that he had received outpatient mental health treatment from 2000-2007, but had never received inpatient mental health treatment.  Id.  He denied suicidal or self-injurious behavior.  Id.  He reported that he had been assaultive but denied that he had ever seriously injured anyone in fights.  Id.  He reported that: he started smoking marijuana at age 12, he smoked 3 joints per week, and last smoked marijuana the day before the appointment; he started smoking cocaine in his mid-20s and last smoked cocaine over the holidays; and he drank socially.  Id. at 451.  Claimant's mental status exam revealed that: he presented as sad looking; he was friendly, communicative and casually groomed, but tense; his speech was normal; his mood and thought content were depressed; his affect was congruent with mood; he had no hallucinations or delusions; his associations, short and long term memory, and judgment were intact, and his cognitive functioning and fund of knowledge were intact and age appropriate; his insight was normal; and there were no signs of hyperactive or attentional difficulties.  Id. at 453.  He was diagnosed with major depressive disorder, recurrent, moderate; cannabis abuse; cocaine abuse; and nicotine dependence.  Id.  He was referred for a psychiatric evaluation and individual therapy.  Id.

On July 19, 2016, Claimant underwent a mental health evaluation by psychiatrist Asim Nisar, M.D. ("Dr. Nisar").  Id. at 468.  Claimant's chief complaint was that he was depressed and

was not able to work due to arthritis and muscle issues.  Id.  He reported a past medical history of

back pain, muscle pain, and arthritis.  Id.  He reported anxiety and panic attacks at times.  Id.  He

had previously taken antidepressants but was not taking any at the time of the evaluation.  Id.

Claimant's reported medical diagnoses were arthralgias in multiple sites; dyslipidemia; gastritis;

lower back pain; muscle spasm; and rheumatoid arthritis.  Id. at 470.  Claimant's mental status

exam revealed that: he appeared sad, anxious, and unhappy; his language skills and his short and

long term memory were intact; he showed signs of moderate depression; he showed no signs of

hallucinations or delusions; his associations were intact and logical; his thought content appeared

appropriate; he denied suicidal ideas or intentions; his fund of knowledge was intact and age

appropriate; he was fully oriented; his insight and judgment were fair; he showed signs of anxiety;

and he displayed a short attention span and physical hyperactivity.  Id. at 471.  He was diagnosed

with major depressive disorder, recurrent, moderate; cannabis abuse; cocaine abuse; and nicotine

dependence.  Id. at 471.  Dr. Nisar prescribed an antidepressant.  Id.

Claimant was seen again by Dr. Nisar for assessment on June 15, 2017.  Id. at 780-90.

Claimant stated that: he was stressed and depressed; he got mad and had outbursts; he had no place

to stay; he was not able to work due to arthritis and muscle issues; and he had issues with his

family.  Id. at 784.  His stressors were not having housing or money.  Id.  Dr. Nisar noted that

Claimant had not been seen since 2016.  Id. at 785.  He reported that he that he had not smoked

marijuana in a long time and had not smoked cocaine in over a year.  Id.  He stated that he was

compliant with his antidepressant medication until he began to experience sexual impotence and

erectile dysfunction, and that he stopped taking the medication in 2016.  Id. at 785-86.  He reported

that, mentally, the medications were effective, and he could see a difference in his mood and

willingness to be around other people.  Id. at 786.  He reported that he had been in a relationship

with a woman for the past two years, that he did not have a stable income, and that he was homeless. Id. at 787. Claimant's mental status exam revealed that: he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; his affect was inappropriate in that he expressed inappropriate anger; his thinking was logical and thought content was appropriate; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; he was able to think in abstract terms, do simple arithmetic calculations, and was familiar with current events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety. Id. at 788-89. His behavior during the appointment was cooperative and attentive with no gross behavioral abnormalities, and he displayed no signs of withdrawal or intoxication. Id. at 789. He was diagnosed with depressive disorder due to another medical condition, with depressive features, and tobacco use. Id. at 777. His cannabis use and cocaine use were in full remission. Id. Claimant stated that he was doing poorly with depression, anxiety, and anger issues, and rated his pain as 8/10. Id. Claimant was instructed to start antidepressant and anxiolytic medications as prescribed. Id. at 790.

Claimant was seen by Dr. Nisar for a follow up appointment on June 22, 2017. Id. at 776. Claimant stated that: he was still depressed and anxious; he had panic attacks; he had no place to stay; he could not work because of arthritis and muscle issues; and he was having issues with his family and having outbursts. Id. Claimant's mental status exam revealed that: he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; moderate signs of depression were present; his affect was appropriate;

his thinking was logical and thought content was appropriate; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; his thoughts were loosely associated in a circumstantial way; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety. Id. at 776-77. He was diagnosed with depressive disorder and tobacco use. Id. at 777. His cannabis use and cocaine use were in full remission. Id. Dr. Nisar adjusted Claimant's antidepressant and anxiolytic medications and instructed him to take medications as prescribed. Id.

Claimant was seen by Dr. Nisar for a follow up appointment on June 28, 2017. Id. at 769. Claimant stated that: he was doing better; his irritability was better and he had been out and about on the day of the visit; there were periods when he was down and he was still suffering from arthritis, muscle issues, and issues with his family. Id. Claimant's mental status exam revealed that; he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; his affect was appropriate; his thinking was logical and thought content was appropriate; his thoughts were loosely associated in a circumstantial way; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety. Id. at 769-70. He was diagnosed with depressive disorder and tobacco use. Id. at 770. Claimant was instructed to continue antidepressant and anxiolytic medications as prescribed. Id. at 753.

Claimant was seen by Dr. Nisar for a follow up appointment on August 9, 2017.  Id. at 751. Claimant stated that he was tired all the time and was having difficulty sleeping, but that his depression and irritability were better, and that he was still suffering from arthritis, muscle issues, and issues with his family.  Id.  Claimant's mental status exam revealed that: he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; his affect was appropriate; his thinking was logical and thought content was appropriate; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety.  Id. at 751-52.  He was diagnosed with depressive disorder and tobacco use.  Id. at 752.  Claimant was instructed to continue antidepressant and anxiolytic medications as prescribed.  Id.

Claimant was seen by Dr. Nisar for a follow up appointment on September 27, 2017.  Id. at 739.  Claimant stated that: he could not work because of health issues; he was anxious and depressed; he saw a back surgeon who said there was nothing he could do and told him there was nothing he could take for arthritis.  Id.  A mental status exam of Claimant revealed that: he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; his affect was appropriate; his thinking was logical and thought content was appropriate; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention

span and made poor eye contact; and he showed signs of anxiety.  Id. at 740.  He was diagnosed with depressive disorder and tobacco use.  Id. at 770.  Claimant was instructed to continue antidepressant and anxiolytic medications as prescribed and return in four weeks.  Id.

Claimant was seen by Dr. Nisar for a follow up appointment on March 6, 2018.  Id. at 1001. Claimant stated that he was still having a lot of pain, and that he had claustrophobia and could not complete an MRI.  Id. at 1001-02.  He was not taking antidepressants.  Id.  at 1002.  A mental status exam of Claimant revealed that: he was morose in appearance, downcast, inattentive, and anxious; he displayed signs of moderate depression; his speech was normal; his language skills and associations were intact; his affect was appropriate, full range, and congruent with mood; his thoughts were loosely associated in a circumstantial way; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety.  Id. at 1002-03. He was diagnosed with depressive disorder and tobacco use.  Id. at 1003.  Claimant stated that he wanted to hold off on psychotropic medications but agreed to take medications as prescribed.  Id.

Claimant was seen by Dr. Nisar for a follow up appointment on May 30, 2018.  Id. at 988. He stated that he was sleeping slightly better and that he was taking his medications.  Id.  A mental status exam of Claimant revealed that: he was morose in appearance, downcast, inattentive, and anxious; he displayed signs of moderate depression; his speech was normal; his language skills and associations were intact; his affect was appropriate, full range, and congruent with mood; his thoughts were loosely associated in a circumstantial way; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process;

he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety.  Id. at 988-89.  He was diagnosed with depressive disorder and tobacco use.  Id. at 989.  Claimant was instructed to continue to take medications as prescribed.  Id.

Claimant was seen by Dr. Nisar for a follow up appointment on June 20, 2018.  Id. at 980.  He stated that he was having severe muscle spasms and he was still depressed.  Id.  A mental status exam of Claimant revealed that: he was morose in appearance, downcast, inattentive, and anxious; he displayed signs of moderate depression; his speech was normal; his language skills and associations were intact; his affect was appropriate, full range, and congruent with mood; his thoughts were loosely associated in a circumstantial way; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety.  Id. at 981-82.  He was diagnosed with depressive disorder and tobacco use.  Id. at 982.  Claimant was instructed to continue to take medications as prescribed.  Id.

Claimant was seen by Dr. Nisar for a follow up appointment on August 14, 2018.  Id. at 964.  Claimant reported feeling tired and hopeless, having trouble falling asleep, and experiencing loss of interest or pleasure in doing things.  Id.  Claimant stated that he had mood swings and anxiety, and that his pain level after surgery was 10/10.  Id. at 965.  A mental status exam of Claimant revealed that: he was morose in appearance, downcast, inattentive, and anxious; his speech was normal; his language skills and associations were intact; his affect was appropriate; his

thinking was logical and thought content was appropriate; he denied suicidal or homicidal ideas or intent; he showed no signs of hallucinations, delusions, or other indicators of psychotic process; he had diffuse memory loss for recent or remote events; his vocabulary and fund of knowledge indicated cognitive functioning in the normal range; his speech was fluent; his insight and judgment were fair; he had a short attention span and made poor eye contact; and he showed signs of anxiety.  Id. at 965-966.  He was diagnosed with depressive disorder and tobacco use.  Id. at 966.  Claimant was instructed to continue to take medications as prescribed.  Id. 996-97.

### B.  Non-treating Sources

#### 1) State Agency Psychological Consultant John Thibodeau, Ph.D. ("Dr. Thibodeau")

On March 14, 2017, Dr. Thibodeau completed a Psychiatric Review Technique ("PRT") for Claimant.  Id. at 107-08.  Dr. Thibodeau opined that Claimant had mild difficulties in understanding, remembering, or applying information, in interacting with others, in concentration, persistence, and maintaining pace, and in adapting or managing himself.  Id.  at 107.  Dr. Thibodeau explained that the functionality data was in keeping with the medical evidence of record in the file in that Claimant did not have severe impairments independent of his physical limitations. Id. at 107-08.

#### 2) State Agency Psychologist Consultant Jill Rowan, Ph.D. ("Dr. Rowan")

On April 20, 2017, Dr. Rowan completed a PRT for Claimant.  Id. at 142-43.  Dr. Rowan opined that Claimant had mild difficulties in understanding, remembering, or applying information, in interacting with others, in concentration, persistence, and maintaining pace, and in adapting or managing himself.  Id. at 142.  Dr. Rowan explained that all evidence showed that Claimant's depression was not severe based on the mental health notes/mental status examinations and the activities of daily living collected.  Id.

**FUNCTION REPORT**

On January 30, 2017, Claimant completed a function report in which he stated he hurt all the time and there was not much he could do physically. Id. at 326-27. He stated that he took care of his mother who was 90 years old, doing as much as he could when needed. Id. at 327. He stated that his sisters and brothers helped him care for their mother. Id. He stated that he used to be able to do everything before his illness, and that he could not sleep at times due to his illness. Id. He stated that he had problems putting on his socks and shoes and washing his back and feet, but he had no problem caring for his hair, shaving, or feeding himself. Id. He stated that his legs went numb when he used the toilet. Id. He stated that he did not need reminders to take care of his personal needs or to take his medicine. Id. at 328. He stated that he prepared his own meals when he was able to, which took him less than 5 minutes; that he did laundry when he was able to; and that he needed encouragement and motivation to do these things. Id. He stated that he did not do housework or yard work due to pain. Id. at 329.

Claimant stated that he barely went outside due to pain and depression. Id. at 329. He was able to go out alone using public transportation or riding in a car; he did not drive. Id. He was able to go shopping in stores for what he needed, as needed. Id. He shopped once a month for 45 minutes to 1 hour. Id. He stated that he was able to count change, pay bills, have a savings account, and use a checkbook. Id. He stated that his ability to handle money had not changed since his illness began. Id. at 330. He stated he enjoyed fishing and singing, and he used to do these things very often and very well, but everything had to stop since his illness began. Id.

Claimant stated that he did not spend time with others; he went out to see the doctor on a regular basis when he had appointments; and sometimes he needed someone to accompany him. Id. He reported that he had problems getting along with his sister who was a recovering crack

addict.  Id. at 331.  He stated that he barely attended church services due to pain.  Id.  He stated

that his conditions affected his lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling, stair climbing, seeing, memory, completing tasks, concentration, using his hands, and

getting along with others because of pain.  Id.  He stated that he was right-handed, and that he

could walk 5 blocks before needing to rest for a few minutes; that he could finish what he started;

and that he could follow written instructions and spoken instructions very well.  Id.  He stated that

he could get along with authority figures very well; but did not handle stress or changes to routine

well.  Id. at 332.  Claimant stated that he had anxiety, and he used a hand brace to sleep at night,

which was prescribed by a doctor in February of 2016.  Id. at 332.  He stated that he took Celexa

and Lidocaine which caused drowsiness and nausea, and Lyrica which caused drowsiness, nausea,

and lightheadedness.  Id. at 333.

## HEARING TESTIMONY

A hearing was held on December 4, 2018, before ALJ Cartledge, at which Claimant and

VE Lovely testified.  Id. at 46-78.

### I.    Claimant

Claimant testified that he was 5'7" tall and weighed 178 pounds.  Id. at 50.  He had lost his

residence and was staying with his brother and his mother.  Id. at 50-51.  He had children who did

not live with him.  Id. at 50.  He had not worked since 2015 because of muscle spasms.  Id. at 52.

From 2009-2013, he worked for a Baptist Church doing property maintenance, which involved

unloading trucks, cutting the grass, and everything down to baking cookies.  Id.  at 52.  He stopped

working because he was laid off from that job in 2013.  Id. at 52-53.  After that, he worked for a

company for about 8 months doing plastering for 40 hours per week, earning about $13 or $14

dollars an hour, before he was laid off towards the end of 2014.  Id. at 53-54.  Claimant has a high

school education.  Id. at 56.

Claimant testified that his symptoms were numbness and radiating pain through his legs,

and problems with breathing sometimes.  Id. at 57.  He stated that he needed to lie down a lot to

keep his legs up; and that he had lost everything and was trying not to give up.  Id.  He stated that

he could not sit at a desk and perform sedentary work because of his arthritis and spasms.  Id. at

61.  He did not take anything for the arthritis because it was incompatible with his colon surgery

which was performed on July 26, 2018.  Id. at 62-63.  He stated that he still had pain from the

surgery and could not walk the distance from his house to the bus stop.  Id. at 63.  He had a lot of

breathing problems from COPD, which was diagnosed in 2011 or 2012, while he was still working.

Id. at 64.  He needed to lie down because if he sat up for a period of time, his legs went numb from

arthritis.  Id. at 65.  He had knee surgeries in 1997 or 1998 paid for by worker's compensation, and

he also received money from worker's compensation.  Id. at 67.  He received SSI and Title II

disability benefits from 2000-2009 due to his knees, back, bulging discs, and his meniscus, but he

stopped receiving payments because he got a job.  Id. at 67-70.  He was affected by carpel tunnel

syndrome because he has been playing a variety of instruments since 1976, but his joints in both

hands were turning, and it hurt to play.  Id. at 70-71.  He had never typed, and he did not think he

could type.  Id. at 71.  At night, he woke up to rub his hands because they hurt.  Id.  Doctors told

him he needed surgery on his hands and on his feet because he had bone spurs and told him that

his body was covered with inflammation from arthritis.  Id. at 72.  His right shoulder hurt and

snapped, and injections helped for two to four months at a time.  Id. at 72-73.  His doctors told him

to keep him legs elevated.  Id. at 73.

## II.     VE Lovely

VE Lovely classified Claimant's prior work as follows:

➢ Plaster helper, DOT #869.687-026,[6] with an exertional level of very heavy[7] and a Specific Vocational Preparation (hereafter, "SVP") of 2;[8]

➢ Maintenance worker, DOT #382.664-010, with an exertional level of medium and an SVP of 3.[9]

Id. at 56.

ALJ Cartledge posed to VE Lovely two hypotheticals for an individual of Claimant's age,

with his education and work experience who:

1) was limited to light work; except that the individual would be limited to only occasionally (occasionally defined as cumulatively 1/3 or less of an 8 hour workday) lift and/or carry, including upward pulling, of 20 pounds and frequently (frequently being defined as cumulatively between 1/3 and 2/3 of an 8 hour workday) lift and/or carry, including upward pulling, 10 pounds; stand and/or walk with normal breaks for 6 hours in an 8 hour workday; sit with normal breaks for 6 hours in an 8 hour workday; no limits regarding pushing and pulling, including operation of hand and/or foot controls, except as otherwise shown for lifting and/or carrying in the hypothetical; can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds; can frequently stoop by bending at the waist, frequently kneel, and frequently crouch (i.e., bending at the knees); can occasionally crawl; limited to frequent

---

[6] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities, and defines the structure and content of all listed occupations.     See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[7] "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work." 20 C.F.R. §§ 404.1567(e) and 416.967(e).

[8] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."     See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month." Id.

[9] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c) and 416.967(c).  An SVP of 3 means that preparation for the job should take "[o]ver 1 month up to and including 3 months." http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

overhead reaching with the right dominant arm; and must avoid concentrated exposure to vibration.   (Hypothetical No. 1).

2) had the same abilities as the individual in Hypothetical No. 1; except that the individual would be limited to two hours or less standing and walking during an eight-hour workday. (Hypothetical No. 2).

Id. at 75-78.

VE Lovely testified that the individual in Hypothetical No. 1 would not be able to perform

Claimant's past work.  However, VE Lovely testified that the individual in Hypothetical No. 1

could perform the following jobs:

➢ Housekeeper, DOT #323.687-014, with an exertional level of light and an SVP of 2, with 99,400 jobs in the national economy;

➢ Towel folder, DOT #209.587-010, with an exertional level of light and an SVP of 2, with 13,700 jobs in the national economy; and

➢ Office helper, DOT #239.567-010, with an exertional level of light and an SVP of 2, with 10,900 jobs in the national economy.

Id.  at 76-77.

VE Lovely testified that the individual in Hypothetical No. 2 would be limited to only

sedentary work.  Id. at 77-78.

## **STANDARD OF REVIEW**

A federal court's "review of a social security case is demarcated by a deferential

reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Cartledge determined that Claimant had not engaged in SGA since November 8, 2015, the alleged onset date.  TR. 29.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Cartledge found that Claimant suffered from the following severe impairments: dysfunction-major joints, spine disorders, osteoarthritis and allied disorders, and COPD.  TR. 29.  ALJ Cartledge then proceeded to step three.  Id. at 34.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Cartledge determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 34.  Therefore, ALJ Cartledge proceeded to step four.  Id.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238. As to the first prong, ALJ Cartledge determined that Claimant had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could only occasionally (occasionally defined as cumulatively 1/3 or less of an 8 hour workday) lift and/or carry (including upward pulling) 20 pounds and frequently (frequently being defined as cumulatively between 1/3 and 2/3 of an 8 hour workday) lift and/or carry (including upward pulling) 10 pounds. The claimant can stand and/or walk (with normal breaks) for a total of 6 hours in an 8 hour workday and sit (with normal breaks) for a total of 6 hours in an 8 hour workday. The claimant has no limits regarding pushing and/or pulling (including operation of hand and/or foot controls), except as otherwise shown for lift and/or carry in this residual functional capacity. The claimant can frequently climb ramps/stairs and occasionally climb ladders/ropes/scaffolds. The claimant can frequently stoop (i.e., bending at the waist), kneel, and crouch (i.e., bending at the knees); and can occasionally crawl. The claimant is limited to frequent overhead reaching with the right dominant arm. The claimant must avoid concentrated exposure to vibration.

TR. 34. Based on Claimant's RFC, ALJ Cartledge moved to prong two of step four and concluded that Claimant was not able to perform any past relevant work. Id. at 38. ALJ Cartledge then proceeded to the fifth and final step. Id. at 39.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC. Phillips, 357 F.3d at 1239-40. ALJ Cartledge determined that, given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform. TR. 39.

Therefore, ALJ Cartledge concluded that Claimant was not under a disability, as defined in the Social Security Act, from November 8, 2015, through the date of the Unfavorable Decision. Id. at 40.

**DISCUSSION**

As noted above, Claimant argues that:

I.      The ALJ erred in determining the RFC Assessment because he failed to:

      a.   Properly evaluate Claimant's mental impairments.

      b.   Account for functional limitations due to severe COPD.

      c.   Consider whether Claimant required a cane to ambulate.

      d.   Properly consider Claimant's diverticulitis.

II.     The ALJ failed to properly assess Claimant's subjective symptoms.

See Claimant's Motion for Summary Judgment [D.E. 15]. The undersigned finds no merit in any of the contentions.

**I.      Whether the ALJ erred in determining the RFC Assessment.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p.[10] Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id. "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'" Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting Foote v. Chater, 67 F.3d 1553,

---

[10] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC. SSR 96–8p, 1996 WL 374184 (July 2, 1996). According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination. Id.; see also Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer, 395 F.3d at 1210).

Claimant assigns four bases for his contention that ALJ Cartledge erred in formulating his RFC assessment.  As discussed below, the undersigned finds no merit in any of these arguments.

**a. Whether the ALJ failed to properly evaluate Claimant's mental impairments.**

First, Claimant argues that the ALJ erred in finding that Claimant's depressive disorder was not severe at step two of the five-step sequential process on the grounds that Claimant had no more than mild limitations in mental functioning and that his depressive disorder had no impact on his ability to work.  See Claimant's Motion for Summary Judgment [D.E. 15 at 15-18].

"At step two [of the sequential evaluation process] the ALJ must determine if the claimant has any severe impairment.  This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).  "[S]tep two requires only a finding of 'at least one' severe impairment to continue on to the later steps. . . . [T]here is no need for an ALJ to identify every severe impairment at step two." Tuggerson-Brown v. Comm'r of Soc. Sec., 572 F. App'x 949, 951 (11th Cir. 2014).

In step two of the sequential evaluation process, ALJ Cartledge found that Claimant had multiple severe impairments, consisting of dysfunction of major joints, spine disorders, osteoarthritis and allied disorders, and COPD, and then proceeded to step three. TR. 29.  Because ALJ Cartledge found that Claimant suffered from at least one severe impairment and proceeded to step three, there is no error resulting from his non-inclusion of depressive disorder at step two. Jamison, 814 F.2d at 588; Tuggerson-Brown, 572 F. App'x at 951.

Next, Claimant argues that the ALJ improperly minimized Claimant's mental status issues by failing to note some findings from Claimant's treatment notes, such as observations that he was irritable or inattentive, had short attention span, or poor eye contact.  See Claimant's Motion for Summary Judgment [D.E. 15 at 15-16].  However, ALJ Cartledge did specifically discuss Claimant's irritability and short attention span, noting that, "[a]lthough these reports indicated that the claimant's short attention span was evident and noted the presence of physical hyperactivity, they noted the claimant's cognitive functioning and fund of knowledge were intact and age appropriate and that his short term memory, long term memory, and ability to do abstract and do arithmetic calculations were also intact." TR. 31, 33.   In any event, the ALJ is not required to incorporate every part of Claimant's treatment notes into his discussion.  See Dyer, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'").

Finally, Claimant argues that the ALJ was not permitted to rely on the state agency psychologist consultants' opinion reports that found only mild limitations to his mental functioning because the reports conflicted with Claimant's mental health treatment records indicating that he

had "moderate" depression or, on occasion, "severe" major depression.  See Claimant's Motion

for Summary Judgment [D.E. 15 at 17-18].  Claimant relies on Edwards v. Sullivan, 937 F.2d 580

(11th Cir. 1991), where the court stated that the "report of a non-examining doctor is accorded

little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot

constitute substantial evidence."  Id. at 584.  However, in Edwards, the court was referring

specifically to inconsistencies in *medical opinion reports* between examining doctors and non-

examining doctors, not to medical records as a whole.  In this case, Claimant has not submitted

into evidence any medical opinions issued by his examining doctors regarding his limitations.

Moreover, ALJ Cartledge found the opinions of Dr. Thibodeau and Dr. Rowan, the State

agency psychologists, persuasive because they were consistent with the overall record, which

indicated generally benign findings; and because Dr. Thibodeau and Dr. Rowan were familiar with

the SSA's disability program.  TR. 32-34, 38.  Dr. Thibodeau and Dr. Rowan opined that Claimant

had mild limitations in the areas of understanding, remembering, applying information, interacting

with others, concentrating, persisting, maintaining pace, and adapting or managing himself.  Id. at

32-34.  ALJ Cartledge found that this was consistent with Claimant's medical record indicating

that: Claimant's associations, thinking, and thought content were intact, logical, and appropriate;

his cognitive functioning and fund of knowledge were intact and age appropriate; his short term

memory, long term memory, and ability to do abstract and arithmetic calculations were intact; his

language skills were intact and his speech was coherent, spontaneous, and normal in rate and

volume; and he was fully oriented, his insight and judgment were fair.  Id.

Based on the medical record and the opinions of the State agency psychologists, ALJ

Cartledge found that Claimant's medically determinable mental impartments did not cause more

than minimal limitations in his ability to perform basic mental work activities.  Id. at 31.  Thus,

ALJ Cartledge's determinations were sufficiently supported by substantial evidence.  See Strickland, 516 F. App'x at 831 ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer, 395 F.3d at 1210).

Therefore, there is no error in ALJ Cartledge's evaluation of Claimant's mental impairments.

**b.  Whether the ALJ failed to account for Claimant's physical functional limitations due to severe COPD.**

Claimant argues that the ALJ erred by not finding any additional limitations due to Claimant's COPD, given that the ALJ listed COPD as one of Claimant's severe impairments.  See Claimant's Motion for Summary Judgment [D.E. 15 at 18-19].   However, Claimant did not provide evidence that he had any additional physical limitations due to COPD.  It is Claimant's burden to establish the extent of his impairments and produce evidence to support his claims.  See 20 C.F.R. §§ 404.1529, 416.929.

In his discussion of Claimant's medical records, ALJ Cartledge noted that Claimant's chest x-rays showed no evidence of acute cardiopulmonary disease, and that Dr. Pace indicated that Claimant's lungs were within normal limits.  TR. 36-38.  The ALJ also noted that Claimant reported smoking half a pack of cigarettes per day and was counseled on smoking cessation.  Id. at 36.  Dr. Clear, the State agency medical consultant, assessed Claimant's physical limitations and explained that the medical record supported no severe respiratory impairments.  Id. at 130. ALJ Cartledge assigned significant weight to the opinion rendered by Dr. Clear to the extent it was consistent with the RFC, and because Dr. Clear was familiar with the Social Security Program and had the opportunity to review the record prior to rendering his report.  Id. at 38.

Therefore, ALJ Cartledge did not err in his assessment of Claimant's physical functional limitations notwithstanding his listing of COPD as one of Claimant's severe impairments.

**A. Whether the ALJ failed to consider whether Claimant required a cane to ambulate.**

Claimant argues that Dr. Torres prescribed a cane and back brace on May 8, 2017, and knee brace on July 14, 2017, and that the ALJ failed to consider whether these devices were necessary or how they impacted the RFC assessment.  See Claimant's Motion for Summary Judgment [D.E. 15 at 17].  However, other than Dr. Torres' treatment plan note requesting that Claimant be provided with a cane "if available", there is no record evidence that Claimant used a cane to ambulate.  TR. 802.  In Claimant's Function Report, Claimant was specifically asked if he used a cane and he indicated that he did not.  Id. at 332.  Claimant stated that the only device he used were hand braces to sleep at night.  Id.

Therefore, there was no basis for ALJ Cartledge to consider the use of a cane in formulating Claimant's RFC.

**d. Whether the ALJ failed to properly consider Claimant's diverticulitis.**

Claimant argues that the ALJ erred by failing to account for the episodic nature of his diverticulitis when the ALJ determined that it was not severe; and that the ALJ failed to consider what limitations were caused by diverticulitis.  See Claimant's Motion for Summary Judgment [D.E. 15 at 17-19].  ALJ Cartledge specifically discussed Claimant's history of diverticulitis, noting that Claimant had required hospitalizations in the past, but that Dr. Larsen's colorectal cancer screening report from January 17, 2017 indicated that Claimant was then "completely asymptomatic." TR. 30, 549.  ALJ Cartledge also noted that Claimant underwent robotic sigmoid resection surgery in July of 2018, and that the record was devoid of any record evidence that Claimant had any further significant problems related to diverticulitis after his surgery.  Id. at 31.

In formulating Claimant's RFC, ALJ Cartledge explained that he "considered all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1527 and 416.927 and SSR 16-3p"; and that he "also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927."  TR. 34.

Moreover, the ALJ conducted a detailed discussion and analysis of Claimant's medical record, id. at 30-33, 35-38, and concluded that it revealed generally benign mental status exams, consistently showed overall normal physical examination findings, and indicated that lab results were generally within normal limits.  Id. at 36.  ALJ Cartledge noted that nothing in the medical record indicated that Claimant was advised to implement any restrictions that would be more limiting than those in the RFC assessment.  Id. at 38.  Additionally, the record showed that Claimant continued to engage in a variety of activities of daily living, including independent cooking, cleaning, shopping, walking for 5 blocks without rest, and taking care of his mother.  Id. at 326-32.  Furthermore, ALJ Cartledge found the state agency consultants' opinions regarding Claimant's limitations to be persuasive.

Given the foregoing, substantial evidence in the medical record supports the ALJ's RFC assessment; therefore, there is no error with regard to the ALJ's consideration of Claimant's diverticulitis.  See Strickland, 516 F. App'x at 831.

Based on the foregoing, the undersigned concludes that the ALJ did not err in formulating Claimant's RFC assessment.

## II.        Whether the ALJ failed to properly assess Claimant's subjective symptoms.

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could

reasonably be expected to produce the alleged symptoms." Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities." Contreras-Zambrano, 724 F. App'x at 703 (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  "[An ALJ] will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]."  20 C.F.R. § 404.1529(c)(4).  SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49, 463.

ALJ Cartledge explained his assessment of Claimant's allegations of his symptoms and limitations as follows:

> [Claimant] testified that he cannot work because muscle spasms keep him from working.  He said he experiences radiating pain and numbness in his legs, that he lies down a lot, that he often elevates his legs, and that he sometimes has difficulty breathing.  The claimant's attorney . . . asked the claimant if he would be able to work on a daily basis performing a sedentary desk job that involved sitting at a desk for the day and the claimant responded that he would not be able to do the desk job . . . due to arthritis and spasms.

> [C]laimant testified that all of the joints on both of his hands were bending, that he experiences chronic pain, that he has never typed, and that he can only write for a short period of time.  The claimant went on to testify that he has played instruments (including the flute, saxophone, etc.) since 1976.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

40

TR. 35.  ALJ Cartledge supported his finding by citing to specific record evidence indicating, *inter alia*: that: Claimant's medical records from Camillus House consistently showed overall normal physical examination findings and indicated that laboratory results were generally within normal limits; that Dr. Pace noted that Claimant's lab results did not suggest inflammation or rheumatoid arthritis; and that Claimant's hospital records indicated that physical examination findings related to his musculoskeletal system, chest, and lungs revealed no abnormalities.  Id. at 35-38.  ALJ Cartledge also noted: that Claimant used to be on disability, but he declined it because he no longer needed it; that Claimant's work history showed that he worked only sporadically prior to the alleged disability onset date, which raised a question as to whether his continued unemployment was actually due to medical impairments; and that his two previous jobs ended due to downsizing or layoffs.  Id. at 36-37.

Because ALJ Cartledge supported his findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of his symptoms with substantial evidence, there is no error in the ALJ's assessment of Claimant's alleged symptoms and limitations.  See Strickland, 516 F. App'x at 831.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 15] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 18] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file timely objections may bar the parties from

attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 22nd day of June, 2021.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:      United States District Judge Jose E. Martinez
         Counsel of Record